**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CHELSEA ELIZABETH MANNING | ) | |
| United States Disciplinary Barracks | ) | |
| 1301 North Warehouse Road | ) | |
| Fort Leavenworth, KS  66027-2364 | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civ. No. _____ |
| | ) | |
| THE HONORABLE CHUCK HAGEL | ) | |
| Secretary of Defense | ) | |
| 1000 Defense Pentagon | ) | |
| Washington, DC  20301-1000 | ) | |
| | ) | |
| MAJOR GENERAL | ) | |
| DAVID E. QUANTOCK | ) | |
| Provost Marshal General of the | ) | |
| United States Army | ) | |
| Department of the Army | ) | |
| Army Corrections Command | ) | |
| 150 Army Pentagon | ) | |
| Washington, DC 21310-0150 | ) | |
| | ) | |
| COLONEL ERICA NELSON | ) | |
| Commandant | ) | |
| United States Disciplinary Barracks | ) | |
| 1301 North Warehouse Road | ) | |
| Fort Leavenworth, KS  66027-2364 | ) | |
| | ) | |
| LIEUTENANT COLONEL | ) | |
| NATHAN KELLER | ) | |
| Director Treatment Programs | ) | |
| Military Correctional Complex | ) | |
| 1301 North Warehouse Road | ) | |
| Fort Leavenworth, KS  66027-2364 | ) | |
| | ) | |
| U.S. DEPARTMENT OF DEFENSE | ) | |
| 1400 Defense Pentagon | ) | |
| Washington, DC  20301-1400 | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.      Plaintiff Chelsea E. Manning, a prisoner currently incarcerated at the United States Disciplinary Barracks at Fort Leavenworth, has been denied access to medically necessary treatment for her gender dysphoria.  She brings this action to compel Defendants to treat her serious medical needs consistent with their obligation under the Constitution.

## NATURE OF THE ACTION

2.      This action seeks declaratory and injunctive relief to redress Defendants' refusal to provide Plaintiff with medically necessary treatment in violation of Plaintiff's rights under the Eighth Amendment to the United States Constitution.

3.      Defendants have violated the Constitution by denying Plaintiff medically necessary treatment for her diagnosed gender dysphoria, a serious medical condition.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, in that the Complaint arises under the United States Constitution. The request for declaratory relief is based upon 28 U.S.C. § 2201, in that an actual controversy exists between Defendants and Plaintiff over the denial of services that are guaranteed by the United States Constitution.

5.      This Court has personal jurisdiction over each of the Defendants, all of whom are served only in their official capacity.

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1)(A) because at least one of the defendants in this action officially resides in this district and, pursuant to 28 U.S.C. § 1391(e)(1)(B), because a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in this district.

## PARTIES

7.      Plaintiff Chelsea Elizabeth Manning is a Private in the United States Army and is

presently incarcerated at the United States Disciplinary Barracks at Fort Leavenworth, Kansas. She has been diagnosed with a serious medical condition, gender dysphoria, for which she is not receiving medically necessary treatment.

8.      Defendant Chuck Hagel is the Secretary of the United States Department of Defense.  He is sued in his official capacity.  Secretary Hagel has authority, direction and control over the Department of Defense, 10 U.S.C. § 113(b), and is among those responsible for denying Plaintiff medically necessary treatment for gender dysphoria.

9.      Defendant Major General David E. Quantock is the Provost Marshal General of the United States Army, the commanding officer of the Army Corrections Command.  He is sued in his official capacity.  Maj. Gen. Quantock is among those responsible for denying Plaintiff medically necessary treatment for gender dysphoria.

10.     Defendant Colonel Erica C. Nelson is the Commandant of the United States Disciplinary Barracks at Fort Leavenworth (USDB). She is sued in her official capacity. Col. Nelson's is responsible for the health and welfare of prisoners at the USDB and is among those responsible for denying Plaintiff medically necessary treatment for gender dysphoria.

11.     Defendant Lieutenant Colonel Nathan A. Keller is the Director of Treatment Programs at the United States Disciplinary Barracks at Fort Leavenworth (USDB).  He is sued in his official capacity.  Lt. Col. Keller is responsible for providing medical care to individuals confined in the USDB and is among those responsible for denying Plaintiff medically necessary treatment for gender dysphoria

12.     Defendant Department of Defense is a Department of the Executive Branch of the United States Government. The Department of the Army is a component of the Department of Defense.

## FACTS

*Gender dysphoria and the standards of care for this condition*

13.     Gender dysphoria (previously known as gender identity disorder (GID)) is the medical diagnosis given to individuals whose gender identity – their innate sense of being male or female – differs from the sex they were assigned at birth, causing clinically significant distress.  This condition is included in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth ed. (2013) (DSM-V), and recognized by the other major medical and mental health professional groups, including the American Medical Association and the American Psychological Association.[1]

14.     In the DSM-V, the diagnostic criteria for gender dysphoria are:

A. A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, as manifested by at least two of the following:

1. A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics).
2. A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics).
3. A strong desire for the primary and/or secondary sex characteristics of the other gender.
4. A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).
5. A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).
6. A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).

---

[1] *See* American Medical Association, Resolution 122 (A-08) (2008); American Psychological Association, Transgender, Gender Identity, & Gender Expression Non-Discrimination (August, 2008).

      B.  The condition is associated with clinically significant distress or impairment in social, occupational or other important areas of functioning.

15.     There is a medical consensus that gender dysphoria is a serious condition that, without treatment, can lead to serious medical problems, including clinically significant psychological distress, dysfunction, debilitating depression, self-surgery, and suicidality.

16.     Gender dysphoria intensifies over time.  The longer an individual goes without treatment, the greater the risk of severe harms to the individual's physical and psychological health.

17.     Incarcerated individuals, particularly male-to-female transsexuals like Plaintiff, are at a particularly high risk of engaging in self-harm including self-castration when treatment is withheld.

18.     The medically recognized protocols for treating gender dysphoria are the *Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People* developed by the World Professional Association for Transgender Health (WPATH Standards of Care).  WPATH is the leading authority on gender dysphoria.  The WPATH Standards of Care are recognized as authoritative and accepted by the American Medical Association, the Endocrine Society, and the American Psychological Association.[2]

19.     The WPATH Standards of Care provide for the following treatments, some or all of which will be required depending on the needs of the patient:

- Changes in gender expression and role (which may involve living part time or full time in another gender role, consistent with one's gender identity);
- Hormone therapy to feminize or masculinize the body;

---

[2]  *See* American Medical Association, Resolution 122 (A-08) (2008); Endocrine Treatment of Transsexual Persons: An Endocrine Society Clinical Practice Guideline (2009); American Psychological Association Policy Statement on Transgender, Gender Identity and Gender Expression Nondiscrimination (2009).

- Surgery to change primary and/or secondary sex characteristics (e.g. breasts/chest, external and/or internal genitalia, facial features, body contouring)
- Psychotherapy (individual, couple, family, or group) for purposes such as exploring gender identity, role, and expression; addressing the negative impact of gender dysphoria and stigma on mental health; alleviating internalized transphobia; enhancing social and peer support; improving body image; or promoting resilience.

20.     Under the WPATH Standards of Care, the development of any treatment plan and all subsequent treatment must be administered by clinicians qualified in treating patients with gender dysphoria.

21.     Psychotherapy or counseling can provide support and help with the many issues that arise in tandem with gender dysphoria.  Counseling alone, however, is not a substitute for medical intervention where medical intervention is needed nor is it a precondition for such intervention.

22.     Treatment for gender dysphoria through changes in gender expression and role, often referred to as the "real-life experience," involves dressing, grooming and otherwise outwardly expressing oneself consistently with one's gender identity.

23.     The National Commission on Correctional Healthcare (NCCHC) recommends that the medical management of prisoners with gender dysphoria "should follow accepted standards developed by professionals with expertise in transgender health," citing the WPATH Standards of Care.[3]

24.     The Federal Bureau of Prisons and many state and local corrections agencies administer hormone therapy to prisoners with gender dysphoria in their custody and house feminine appearing prisoners in both men's and women's facilities.

---

[3] NCCHC Policy Statement, Transgender Health Care in Correctional Settings (October 18, 2009), http://www.ncchc.org/transgender-health-care-in-correctional-settings.

25.     The Army's medical providers who have evaluated and diagnosed Plaintiff with gender dysphoria recognize that treatment protocols for gender dysphoria should follow the WPATH Standards of Care.

*Plaintiff's gender dysphoria and her attempts to obtain treatment*

26.     Plaintiff's assigned sex at birth was male, but from a young age she experienced the persistent sense that she was "different."  In school she was teased and called names such as "girly-boy," "faggy," and "queer," because she did not conform to expectations of how a boy should look and act.

27.     Throughout childhood, adolescence and young adulthood, Plaintiff wore feminine clothing in private, but this caused her to be overcome with feelings of guilt, leading her to try to repress her femininity and conform to expectations of how males should look and behave.

28.     In 2009, Plaintiff came to terms with the fact that she is a transgender woman and could no longer suppress her female identity.

29.     In May of 2010, Captain Michael Worsley, a clinical psychologist, first diagnosed Plaintiff with gender identity disorder while she was stationed in Iraq.

30.      After her arrest on May 27, 2010 for unlawful disclosure of classified information, Plaintiff was transferred from Iraq to Camp Arifjan, Kuwait, where she was held in pretrial confinement until July of 2010.  At Camp Arifjian, Plaintiff was again diagnosed with gender identity disorder by Dr. Jonathan Richardson, a Navy psychiatrist, and Dr. Eve Weber, a Navy psychologist, but she was not provided with any treatment.

31.     While in confinement in Kuwait, Plaintiff became overcome with anxiety and distress at the realization that she may not receive treatment for gender dysphoria and contemplated self-surgery to relieve her pain.  She also made plans to commit suicide but her plans were discovered and she was placed on suicide watch.

32.     On April 22, 2011, Plaintiff was again diagnosed with gender identity disorder during her Rule 706 Board, the body convened under the Rules for Court-Martial to assess her mental fitness to stand trial.   The Rule 706 Board also documented Plaintiff's request for treatment for gender identity disorder, including permission to grow her hair and otherwise be permitted to follow grooming standards for female detainees and to begin hormone therapy.

33.     On August 21, 2013, Plaintiff was sentenced to serve thirty-five years in prison. The next day – August 22, 2013 – Plaintiff was transferred to the United States Disciplinary Barracks at Fort Leavenworth (USDB), where she remains.   That day Plaintiff made a public statement through counsel announcing her female gender and stating that she would be requesting treatment for gender dysphoria while incarcerated.   She announced, through a statement provided by her counsel to NBC's *The Today Show*, "I am Chelsea Manning. I am a female. Given the way that I feel, and have felt since childhood, I want to begin hormone therapy as soon as possible."[4]  On January 27, 2014, Plaintiff petitioned for a legal name change in the District Court of Leavenworth County, Kansas. This petition was granted and Plaintiff's name was legally changed to Chelsea Elizabeth Manning on April 23, 2014. Her prison records have been updated to reflect the court ordered name change.

34.     In response to Plaintiff's public statement about her gender identity and requested treatment, Kimberly Lewis, a spokesperson for the USDB, told NBC news that "The Army does not provide hormone therapy or sex-reassignment surgery for gender identity disorder."[5]

**Requests for treatment made to the Directorate of Treatment Programs**

35.     Upon her arrival at the USDB on August 22, 2013, Plaintiff submitted a

---

[4] Jonel Aleccia, *Beginning gender change in prison is a long shot* (NBCnews Online Aug. 22, 2013), http://www.nbcnews.com/health/health-news/beginning-gender-change-prison-long-shot-f6C10974050.

[5] *Id*.

memorandum to the Directorate of Treatment Programs (DTP) requesting an evaluation and treatment for gender dysphoria in accordance with the WPATH Standards of Care.

36.      On the day she arrived at the USDB, John Lesniak, Chief Assessment Division of the DTP, conducted a risk and needs assessment of Plaintiff.  Mr. Lesniak designated Plaintiff as high risk for sexual victimization due to, among other things, her transgender status and slight build.  Plaintiff was again designated as high risk to be sexually victimized due to her effeminate mannerisms and transgender status during a Prison Rape Elimination Act (PREA) assessment conducted by Dr. Ellen Galloway on May 30, 2014.

37.      During Mr. Lesniak's risk and needs assessment, Plaintiff inquired about treatment options for gender dysphoria and Mr. Lesniak informed her that Army policy limits treatment for gender dysphoria to psychotherapy and anti-depressant and anti-anxiety medication.

38.      On August 28, 2013, Plaintiff requested a mental health evaluation and treatment for gender dysphoria by submitting a Department of Defense (DD) Form 510 to Lt. Col. Nathan Keller, the Director of Treatment Programs.

39.      In September 2013, Plaintiff was evaluated by Dr. Ellen Galloway, Chief of the Mental Health Division at the USDB.

40.      On September 30, 2013, Dr. Galloway diagnosed Plaintiff with gender dysphoria. That diagnosis was reviewed by Dr. Patrick Armistead-Jehle, another Army psychologist, who concurred with Dr. Galloway's diagnosis in a memorandum dated October 1, 2013.

41.      On October 15, 2013, Lt. Col. Keller sent a memorandum to Steve Lynch, former Deputy Director of the Army Corrections Command, regarding available treatment for Plaintiff at the USDB.  In that memorandum, Keller wrote, "I see no way the USDB can provide a full course of therapy for Mr Manning's Gender Dysphoria … because the USDB cannot house a

female or highly feminized inmate.  Permitting Mr Manning to live as female, much less begin to feminize his body, will create operational challenges as the inmate population respond to these changes."

42.    On October 16, 2013, Dr. Galloway sent a memorandum to Steve Lynch regarding treatment available at the USDB for Plaintiff.  In that memorandum she advised that the ethical principles of psychologists mandate that psychologists only provide services within the scope of their competence and that she does "not have the expertise to develop a treatment plan or provide treatment for individuals with [gender dysphoria]."

43.    On November 25, 2013, a treatment plan for Plaintiff's gender dysphoria was completed by Dr. Galloway based on the recommendations of Army psychiatrist, Dr. Ricky Malone, and sent to the Army Corrections Command.  Only a redacted version of that treatment plan has been disclosed to Plaintiff.

44.    After approximately six weeks passed without treatment being initiated, on January 5, 2014, Plaintiff submitted another DD Form 510 to the Directorate of Treatment Programs requesting a status update on her care.

45.    On April 2, 2014, Plaintiff submitted a request to the DTP for permission to: follow female grooming standards, including standards related to hair length; have female-specific issued clothing; and be given additional female health and grooming items.

46.    On July 23, 2014, having received no response to her April 2, 2014 request for permission to follow female grooming standards, including standards related to hair length, for female-specific issued clothing, and for additional female health and grooming items, Plaintiff renewed that request.

47.    On August 21, 2014, Plaintiff submitted a request for exception to Policy to Army Regulation 670-1 to the Deputy Chief of Staff, G-1, Department of the Army, to permit her, "a

male assigned at birth, to use the female hair grooming, cosmetic, and nail grooming standards in Chapter 1-8 of AR 670-1 for implementing a medically supervised 'Real-Life Experience (RLE)' for [her] diagnosis of Gender Dysphoria under DSM-5."  Plaintiff received no response to that request nor has she received medically necessary treatment in the form of the real-life experience.

**Requests for treatment to the Commandant and through the chain of command**.

48.     On January 21, 2014, having received no response to her DD Form 510 request for a status update, Plaintiff submitted a request for redress to Col. Ledwith, former Commandant at the USDB, and Cpt. Byrd, her commander at the Personnel Control Facility, under Army Regulation (AR) 27-10 and Article 138, Uniform Code of Military Justice (UCMJ). Col. Ledwith has since left her post as Commandant.   Col. Erica Nelson has assumed the command of the USDB as Commandant.  Plaintiff alleged in this request that the actions of Col. Ledwith and Cpt. Byrd in refusing to implement a treatment plan for her gender dysphoria were arbitrary and unreasonable.  As redress she requested that a treatment plan consistent with the WPATH Standards of Care be implemented.

49.     On March 4, 2014, having received no response to her request for redress, Plaintiff submitted a complaint of wrong against Col. Ledwith and Cpt. Byrd under Article 138, UCMJ, for failure to provide appropriate medical care to treat her gender dysphoria and again requested the implementation of a treatment plan in accordance with the WPATH Standards of Care.

50.     On May 7, 2014, Plaintiff learned through counsel that her Article 138 complaint of wrong had been deemed deficient on March 19, 2014, on the grounds that 1) Col. Ledwith was not Plaintiff's commanding officer; and 2) Cpt. Byrd lacked the authority to approve the treatment plan.

51.     On May 29, 2014, Plaintiff filed a request for an exception to the AR 27-10 requirement that complaints be made to a person's chain of command.  Because Plaintiff's chain of command, Cpt. Byrd, was the only proper person against whom to bring an Article 138 complaint of wrong but he had no authority to approve her requested treatment, Plaintiff sought permission to file her complaint against the Commandant of the USDB.  On July 3, 2014, Plaintiff's request for an exception to AR 27-10 was denied.

### Action Request to the Army's Office of the Inspector General

52.     On January 21 2014, at the same time she submitted a request for redress to Col. Ledwith and Cpt. Byrd, Plaintiff also submitted an Inspector General Action Request to the Office of the Inspector General, United States Army Combined Armed Center, Fort Leavenworth, Kansas.  In this request, she alleged that the Directorate of Treatment Programs at the USDB had failed to provide her with medically necessary treatment and she requested treatment in accordance with medical protocols.

53.     On February 21, 2014, Plaintiff was informed by the Office of the Inspector General that her action request had been forwarded to the Western Regional Medical Command (WRMC) Inspector General (IG) at the Joint Base Lewis-McChord.

54.     On April 4, 2014, the WRMC IG informed Plaintiff that her action request had been passed on to the Office of the Surgeon General for the United States Army and that the WRMC IG would be taking no further action on it.

55.     To date, Plaintiff has received no response from the Army Office of the Surgeon General to the action request.

### *The Involvement of the Secretary of Defense*

56.     Since September 2013 Plaintiff has met regularly with Dr. Galloway as part of her general mental health treatment.   During these sessions Plaintiff has repeatedly discussed the

12

anxiety and depression caused by the Army's failure to treat her gender dysphoria. As reflected in her medical records, on multiple occasions Dr. Galloway informed Plaintiff that decisions regarding her treatment would be made by the Office of the Secretary of Defense.

57.    On May 14, 2014, the Associated Press reported that Secretary Hagel had approved plans to transfer Plaintiff into the custody of the Federal Bureau of Prisons so she could receive treatment for gender dysphoria. In those reports, Pentagon press secretary Rear Admiral John Kirby said "No decision to transfer Private Manning to a civilian detention facility has been made, and any such decision will, of course, properly balance the soldier's medical needs with our obligation to ensure she remains behind bars."[6]

58.    On July 17, 2014, the Associated Press reported that the Army's requested transfer of Plaintiff to the Federal Bureau of Prisons had been rejected and that Secretary Hagel had approved an Army recommendation to initiate a "rudimentary level of gender treatment."[7]

*Defendants' Response to Plaintiff's Demand Letter*

59.    On July 2, 2014, Plaintiff, through counsel, advised Defendants in writing that she was being represented by counsel with respect to her medical treatment for gender dysphoria.

60.    On August 11, 2014, Plaintiff, through counsel, sent a letter to Defendants demanding that she receive medical treatment for gender dysphoria in accordance with the WPATH Standards of Care, including hormone therapy and permission to follow female grooming standards in order to express her female gender.

61.    On August 20, 2014, Plaintiff was informed by memorandum that she would be

---

[6] Associated Press, *Chelsea Manning may be transferred to civilian prison for gender treatment* (May 14, 2014), http://www.theguardian.com/world/2014/may/14/chelsea-manning-civilian-prison-gender-treatment.
[7] Associated Press, *Chelsea Manning to begin gender treatment in US military custody* (July 17, 2014), http://www.theguardian.com/world/2014/jul/17/chelsea-manning-gender-treatment-military-custody.

provided with female underwear and sports bras.

62.     On September 2, 2014, Col. Nelson responded to Plaintiff's August 11, 2014 letter on behalf of all recipients.  She stated that Plaintiff's treatment needs were being met because she was receiving psychotherapy that had been expanded sometime after July 18, 2014 "to include therapy for gender dysphoria" and was "permitted to begin the 'real-life-experience' treatment by being issued female undergarments, specifically female underwear and sports bras."

63.     To date, the only psychotherapy that Plaintiff has been receiving has been with Dr. Galloway, who stated that she lacks the qualifications to treat gender dysphoria.

64.     Defendants have not evaluated Plaintiff's treatment needs or had her treated by a clinician qualified to treat gender dysphoria.

65.     Plaintiff continues to be denied treatment in the form of the real-life experience in that she is denied permission to outwardly express her female gender through female hair length and other grooming standards.

66.     Plaintiff continues to be denied hormone therapy.

*Plaintiff's evaluation by Dr. Randi Ettner*

67.     On August 27, 2014, Plaintiff met with Dr. Randi Ettner, an expert in the diagnosis and treatment of gender dysphoria that she retained.

68.     Based on a clinical interview with Ms. Manning, psychodiagnostic assessments, and a review of her medical records, Dr. Ettner confirmed Plaintiff's diagnosis of gender dysphoria, which is persistent and well-documented, and recommended treatment in accordance with the WPATH Standards of Care.

69.     Dr. Ettner specifically recommended the following immediate treatment for Plaintiff's moderate-to-severe gender dysphoria: 1) that Plaintiff be permitted to express her

female gender through growing her hair and having access to other grooming standards and cosmetics that female prisoners are permitted; and 2) that Plaintiff be started on a regimen of hormone therapy to include estrogens and anti-androgens.

70.     Dr. Ettner noted that Plaintiff is experiencing significant distress and is at high risk for serious medical consequences, including self-castration and suicide, if such medically necessary treatment is not promptly provided.

*Plaintiff continues to suffer from the denial of medically necessary treatment*

71.     It has been more than four years since Plaintiff was first diagnosed with gender dysphoria by Army medical personnel and more than a year since that diagnosis was confirmed at the USDB.

72.     Plaintiff remains without a treating doctor who is qualified to treat gender dysphoria.

73.     Plaintiff remains without medically necessary treatment for gender dysphoria, including hormone therapy and access to female grooming standards to express her female gender.  Plaintiff was recently provided female undergarments but she is not permitted to outwardly express her female gender in accordance with medical protocols.

74.     Every day that goes by without appropriate treatment, Plaintiff experiences escalating anxiety, distress, and depression.  She feels as though her body is being poisoned by testosterone.

75.     According to Plaintiff's expert, Dr. Ettner, without hormone therapy and permission to follow female grooming standards to outwardly express her female gender, Plaintiff will suffer continued pain, depression, and anxiety and is at an extremely high risk of self-castration and suicidality.

76.    Plaintiff fears that without appropriate treatment, her anguish will only escalate and she will not be able to survive the 35 years of her sentence, let alone the next few years.

## CLAIM FOR RELIEF

### Violation of the Eighth Amendment to the United States Constitution
### (Asserted by Plaintiff Against all Defendants)

77.    Plaintiff incorporates by reference the allegations of paragraphs 1 through 76.

78.    Plaintiff has repeatedly been diagnosed with gender dysphoria, a serious medical condition, by Army medical providers and outside clinicians.

79.    The Army's doctors recognize that the WPATH Standards of Care are the appropriate medical standards governing the treatment of gender dysphoria.

80.    The Army's doctors recognize changing gender role and expression, also known as the real-life experience, is a necessary part of Plaintiff's treatment but have failed to implement such treatment by denying her permission to outwardly express her female gender by growing her hair and following the other grooming standards applicable to female prisoners.

81.    Under the WPATH Standards of Care, hormone therapy is medically indicated to treat persistent and well-documented gender dysphoria, like the Plaintiff's. Hormone therapy is medically necessary treatment for Plaintiff.  Yet Plaintiff is not being treated with hormone therapy.

82.    Defendants and their agents have stated that hormone therapy and allowing a prisoner to feminize her appearance are not permitted treatments at the USDB.

83.    Denying a prisoner medically necessary treatment violates the Eighth Amendment's prohibition against cruel and unusual punishment.

84.    Plaintiff went without treatment of any kind – let alone necessary and adequate

16

treatment – for more than eight months after a treatment plan was developed recognizing that treatment was necessary.

85.     The psychologist who has been treating Plaintiff has stated that she does not have expertise to provide treatment for gender dysphoria.

86.     As a direct and proximate result of Defendants' purposeful and intentional actions, Plaintiff has suffered and continues to suffer injury, including, without limitation, serious physical, psychological and emotional harm, mental anguish, distress, humiliation, and indignity.

87.     Plaintiff will be irreparably harmed absent injunctive relief.

## PRAYER FOR RELIEF

Plaintiff therefore respectfully requests that this Court grant the following relief:

(a)     Declare that Defendants' actions denying Plaintiff necessary medical treatment for gender dysphoria violate the Eighth Amendment to the United States Constitution;

(b)     Enter an injunction directing Defendants and their agents to provide Plaintiff with clinically appropriate treatment under the *Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People* developed by the World Professional Association for Transgender Health, including, but not limited to, (1) providing hormone therapy for Plaintiff's gender dysphoria; (2) permitting Plaintiff to express her female gender by following female grooming standards, including dress and hair length; and (3) providing Plaintiff with treatment by a clinician who is qualified to treat gender dysphoria.

(c)     Award Plaintiff her reasonable attorney's fees; and

(d)      Award all other relief that the Court deems just and proper.

                              Respectfully submitted,

                              /s/ *Arthur B. Spitzer*
                              Arthur B. Spitzer (D.C. Bar No. 235960)
                              American Civil Liberties Union
                                 of the Nation's Capital
                              4301 Connecticut Avenue, N.W., Suite 434
                              Washington, DC 20008
                              Tel. 202-457-0800
                              Fax 202-457-0805
                              artspitzer@aclu-nca.org

                              Chase B. Strangio
                              Rose A. Saxe
                              James D. Esseks
                              American Civil Liberties Union
                              125 Broad St., 18th Fl.
                              New York, NY 10004
                              Tel. 212.549.2627
                              Fax 212.549-2650
                              cstrangio@aclu.org
                              rsaxe@aclu.org
                              jesseks@aclu.org

                              Stephen Douglas Bonney
                              ACLU Foundation of Kansas
                              3601 Main Street
                              Kansas City, MO 64111
                              Tel. (816) 994-3311
                              Fax (816) 756-0136
                              dbonney@aclukswmo.org

                              David E. Coombs
                              Law Office of David E. Coombs
                              11 South Angell Street, #317
                              Providence, RI  02906
                              Tel. 508-689-4616
                              Fax (508) 689-9282
                              info@armycourtmartialdefense.com

September 23, 2014