**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CHELSEA ELIZABETH MANNING,

Plaintiff,

v.

CHUCK HAGEL, *et al.,*

Defendants.

Civ. No. _____

**MEMORANDUM IN SUPPORT OF
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

Chase B. Strangio
Rose A. Saxe
James D. Esseks
American Civil Liberties Union
125 Broad St., 18th Fl.
New York, NY 10004
Tel. 212.549.2627
Fax 212.549-2650
cstrangio@aclu.org
rsaxe@aclu.org
jesseks@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
   of the Nation's Capital
4301 Connecticut Avenue, N.W., Suite 434
Washington, DC 20008
Tel. 202-457-0800
Fax 202-457-0805
artspitzer@aclu-nca.org

David E. Coombs
Law Office of David E. Coombs
11 South Angell Street, #317
Providence, RI  02906
Tel. 508-689-4616
Fax (508) 689-9282
info@armycourtmartialdefense.com

Stephen Douglas Bonney
ACLU Foundation of Kansas
3601 Main Street
Kansas City, MO 64111
Tel. (816) 994-3311
Fax (816) 756-0136
dbonney@acluvswmo.org

September 23, 2014

**TABLE OF CONTENTS**

INTRODUCTION ...............................................................................................1

FACTS ............................................................................................................1

*Gender Dysphoria*..........................................................................................2

*Ms. Manning's History of Gender Dysphoria and Attempts to Obtain
Treatment in Accordance with Medical Protocols* ................................................4

*Plaintiff's Distress and Urgent Need for Hormone Therapy and Permission
to Follow Female Grooming Standards* ...............................................................10

ARGUMENT ....................................................................................................11

I.  PLAINTIFF HAS A SUBSTANTIAL LIKELIHOOD OF SUCCESS
ON THE MERITS ...........................................................................................11

A. Plaintiff's Gender Dysphoria And Risk Of Engaging In Self-Harm Constitute
Serious Medical Needs For Purposes Of The Eighth Amendment ...........................12

B. Defendants Have Acted With Deliberate Indifference To Plaintiff's Serious
Medical Needs .............................................................................................14

1.  Defendants Have Acted With Deliberate Indifference By Failing to
Provide Adequate Treatment For Plaintiff's Serious Medical Needs...................15

2.  Plaintiff Has Been Categorically Denied Hormone Therapy And Other
Medically Necessary Treatment For Non-Medical Reasons
And With Deliberate Indifference To Her Serious Medical Needs......................20

3.  Prisoners' Medical Care Cannot Be Withheld Based On Pretextual Security
Justifications ...........................................................................................22

II.  PLAINTIFF WILL SUFFER IRREPARABLE INJURY ABSENT AN INJUNCTION .....23

III. THE BALANCE OF HARMS STRONGLY FAVORS PLAINTIFF ..................................25

IV. AN INJUNCTION IS IN THE PUBLIC INTEREST ...........................................25

CONCLUSION..................................................................................................26

## INTRODUCTION

This case concerns the serious pain and anguish caused by the denial of urgently-needed medical care to Plaintiff by the United States Department of Defense and the Department of the Army by and through the named defendants and their agents.  Plaintiff Chelsea Manning is a prisoner at the United States Disciplinary Barracks at Fort Leavenworth, Kansas (USDB) who has gender dysphoria, a serious medical condition.  Defendants are not providing her with medically necessary treatment for this condition.   Specifically, she is being denied hormone therapy and prohibited from expressing her female gender by growing her hair and otherwise following female grooming standards.  Plaintiff is experiencing escalating distress and is at serious risk of severe and imminent harm, including resorting to self-surgery (auto-castration) or suicide, because this medically necessary treatment is being withheld. She moves for a preliminary injunction requiring the Defendants to provide Plaintiff with clinically appropriate treatment under the *Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People* developed by the World Professional Association for Transgender Health, including, but not limited to, (1) providing hormone therapy for Plaintiff's gender dysphoria; (2) permitting Plaintiff to express her female gender by following female grooming standards, including dress and hair length; and (3) providing Plaintiff with treatment by a clinician who is qualified to treat gender dysphoria.

## FACTS

Plaintiff Chelsea Manning is a well-known prisoner serving a thirty-five year sentence at the United States Disciplinary Barracks at Fort Leavenworth, Kansas. (Declaration of Chelsea Elizabeth Manning (Manning Decl.) ¶ 2).  She was first diagnosed with gender dysphoria (what used to be called gender identity disorder (GID)) in 2010. (*Id.* ¶ 13).  Since then, her gender

dysphoria diagnosis has been confirmed multiple times by Army medical providers and civilian experts.  (*Id*. ¶¶ 17-19; Declaration of Dr. Randi C. Ettner (Ettner Decl.) ¶ 39). Yet, despite her well-documented diagnosis and the medical consensus about the proper treatment protocols for this condition, the Defendants have denied Ms. Manning urgently needed and medically necessary treatment for her gender dysphoria.  (Ettner Decl. ¶¶ 46-47, 51, 56).

### *Gender Dysphoria*

Gender dysphoria is a condition in which a person's gender identity – a person's innate sense of being male or female – differs from the sex the person was assigned at birth, causing clinically significant distress.  (*Id*. ¶ 17).  This condition is included in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders*, Fifth ed. (2013) (DSM-V), and is recognized by the other major medical and mental health professional groups, including the American Medical Association and the American Psychological Association.  (*Id*. ¶ 17-18).

The medical protocols for treating gender dysphoria are well established.  The World Professional Association for Transgender Health (WPATH) is the leading medical authority on gender dysphoria and has developed Standards of Care for the treatment of the condition.  (*Id*. ¶ 22-23). These standards, which are recognized as authoritative by every major medical and mental health association, provide for the following treatments, some or all of which will be required depending on the needs of the patient:

- Changes in gender expression and role (which may involve living part time or full time in another gender role, consistent with one's gender identity);

- Hormone therapy to feminize or masculinize the body;

- Surgery to change primary and/or secondary sex characteristics (e.g. breasts/chest, external and/or internal genitalia, facial features, body contouring)

- Psychotherapy (individual, couple, family, or group) for purposes such as exploring gender identity, role, and expression; addressing the negative impact of gender dysphoria and stigma on mental health; alleviating internalized transphobia; enhancing social and peer support; improving body image; or promoting resilience.

(Ettner Decl. ¶ 23).

Changes to gender expression and role to feminize or masculinize one's appearance, often called the "real life experience," are an important part of treatment for the condition for many people. (*Id*. ¶ 30). The real life experience involves dressing, grooming and otherwise outwardly presenting oneself in a manner consistent with one's gender identity. (*Id*.). Through this experience, the shame of growing up living as a "false self" and the grief of being born into the "wrong body" can be ameliorated. (*Id*.). For individuals with persistent and well-documented gender dysphoria, hormone therapy is medically indicated. (*Id*. ¶ 31).

When necessary treatment for gender dysphoria is withheld, the consequences are both foreseeable and disastrous. (*Id*. ¶¶ 19-20). There is a medical consensus that without necessary treatment, gender dysphoria leads to serious medical problems, including clinically significant psychological distress, dysfunction, debilitating depression, and suicidality. (*Id*.). Transgender prisoners with long sentences, and male-to-female transsexuals in particular, are at an exceedingly high risk for severe consequences due to the hopelessness that can result when treatment is withheld indefinitely. (*Id*. ¶¶ 20-21, 52). Without adequate treatment, prisoners with gender dysphoria often resort to self-surgery to remove their testicles or even suicide. (*Id*. ¶¶ 19-20). The National Commission on Correctional Healthcare (NCCHC) recommends that the medical management of prisoners with gender dysphoria "should follow accepted standards

developed by professionals with expertise in transgender health," citing the WPATH Standards of Care.  (*Id.* ¶ 37).

### *Ms. Manning's History of Gender Dysphoria and Attempts to Obtain Treatment in Accordance with Medical Protocols*

Though she was assigned male at birth, from a young age, Ms. Manning felt different from her male peers and was teased and bullied for being effeminate.  (Manning Decl. ¶ 3). Throughout her childhood, adolescence and young adulthood, Ms. Manning would dress and express herself as female in private but would become overcome with guilt and shame afterwards.  (*Id.* ¶ 5).  These feelings of shame caused her to suppress her femininity and attempt to conform to expectations of how men should look and act.  (*Id.* ¶ 4).  Ms. Manning joined the United States Army as an all-source intelligence analyst in 2007 before coming to terms with her transgender identity in 2009.  (*Id.* ¶ 8).

While deployed in Iraq and then in pre-trial confinement, Ms. Manning was diagnosed with gender identity disorder (GID) on multiple occasions.  She was first diagnosed with GID on May 8, 2010 by Capt. Michael Worsely, an Army psychologist in Iraq.  (Manning Decl. ¶ 17). After her arrest for unlawful disclosure of classified information on May 27, 2010, Ms. Manning was transferred from Iraq to Camp Arifjan, Kuwait where she was again diagnosed with GID by military doctors.  (*Id.* ¶ 18).  While in confinement at Camp Arifjan, Ms. Manning grew desperate fearing that she would not receive treatment for her gender dypshoria.  (*Id.* ¶¶ 14, 18). She contemplated ways to remove her testicles and even planned to commit suicide in a moment of extreme distress.  (*Id.* ¶ 14).  Her plans were discovered and she was placed on suicide watch. (*Id.*).  She did not receive treatment for her gender dysphoria in Iraq or Kuwait.  (*Id.* ¶ 18).

From Kuwait she was transferred to Quantico, Virginia on July 29, 2010.  (*Id.* ¶ 15).  On April 22, 2011, Ms. Manning was diagnosed a third time with GID during her Rule 706 Board,

the body convened under the Rules for Court-Martial to assess her mental fitness to stand trial. (*Id.* ¶ 19).  Ms. Manning was convicted at general court martial and on August 21, 2013 she was sentenced to serve thirty-five years in prison.  (*Id.* ¶¶ 2, 16).  The following day she was transferred to the United States Disciplinary Barracks at Fort Leavenworth (USDB), where she remains.  (*Id.* ¶ 16). While in Quantico, Virginia, Ms. Manning did not receive treatment for her gender dysphoria.  (*Id.* ¶ 18).

With her court-martial and sentencing final, Ms. Manning decided to come out publicly about her female gender identity and her desire to begin treatment as soon as possible.  On August 22, 2013, the day she was transferred to the USDB, she announced, through her attorney, on NBC's *The Today Show*, "I am Chelsea Manning.  I am a female.  Given the way that I feel, and have felt since childhood, I want to begin hormone therapy as soon as possible." (Declaration of Chase B. Strangio (Strangio Decl.), Ex. I).  In response to her public announcement that she is female and would be requesting treatment, the Department of the Army announced through a USDB spokesperson that it was the Army's policy not to provide hormone therapy to treat gender dysphoria.  (*Id.*).

On the day she arrived at the USDB, Ms. Manning submitted a memorandum requesting an evaluation and treatment for gender dysphoria in accordance with the WPATH Standards of Care to the Directorate of Treatment Programs (DTP).  (Manning Decl. ¶ 20).  Shortly thereafter, during a routine treatment and risk assessment, when Ms. Manning inquired about treatment options for gender dysphoria, she was informed by John Lesniak, Chief, Assessment Division of the DTP, that it was USDB and Army policy to limit treatment for gender dysphoria to psychotherapy and anti-depressant and anti-anxiety medication.  (*Id.* ¶ 21).  On August 28, 2013, Ms. Manning again requested a mental health evaluation and treatment for gender dysphoria by

submitting a Department of Defense (DD) Form 510 to Lieutenant Colonel Nathan Keller, the Director of Treatment Programs at the USDB.  (*Id*. ¶ 22).

In September 2013, Dr. Ellen Galloway, Chief of the Mental Health Division at the USDB, evaluated Ms. Manning and diagnosed her with gender dysphoria.  (Manning Decl. ¶¶ 24, 27).  Dr. Galloway's diagnosis was reviewed and confirmed by Dr. Patrick Armistead-Jehle, another Army psychologist, on October 1, 2013. (Strangio Decl., Ex. A).

On October 15, 2013, Lt. Col. Keller sent a memorandum to Steve Lynch, former Deputy Director of the Army Corrections Command (ACC), based in Washington, D.C., regarding available treatment for Ms. Manning at the USDB.  In that memorandum, Lt. Col. Keller noted that treatment for gender dysphoria is governed by the WPATH Standards of Care but said "I see no way the USDB can provide a full course of therapy for Mr Manning's Gender Dysphoria … because the USDB cannot house a female or highly feminized inmate.  Permitting Mr Manning to live as female, much less begin to feminize his body, will create operational challenges as the inmate population respond to these changes."  (Strangio Decl., Ex. B).  He recommended possible "stop-gap" treatment options that he identified as "at best stop-gaps [that] will not meet the need."  (*Id*.).  Those options included weekly therapy at the Transgender Institute in Kansas City or supervision of Dr. Galloway by the Transgender Institute.  (*Id*.).

The following day, Dr. Galloway also sent a memorandum to Steve Lynch, ACC, regarding treatment available at the USDB for Ms. Manning.  (Strangio Decl., Ex. C).  In that memorandum she advised that the ethical principles of psychologists mandate that psychologists only provide services within the scope of their competence and that she does "not have the expertise to develop a treatment plan or provide treatment for individuals with [gender dysphoria]."  (*Id*.).

On November 25, 2013, Dr. Galloway finalized a treatment plan for Ms. Manning's gender dysphoria based on recommendations made by Dr. Ricky Malone, whom she described as an expert provided by the Western Region of the Army Medical Department,[1] and sent it to the Army Corrections Command.  (Strangio Decl., Ex. D).  The treatment plan identified the proper treatment protocols for treating gender dysphoria as those outlined in the WPATH Standards of Care.  (*Id*.).  The plan stated that (as of November 1, 2013) Dr. Malone recommended psychotherapy and real life experience – a term used to refer to outward changes to gender expression and role to be consistent with one's gender identity – as the minimal acceptable therapeutic interventions.  (Strangio Decl., Ex. D; Ettner Decl. ¶¶ 23, 30).  Specifically, the plan recommended that Ms. Manning receive weekly psychotherapy with Dr. Galloway to address issues specific to gender dysphoria and to receive treatment in the form of the real life experience by being provided with female underwear and sports bras.  (Strangio Decl., Ex. D).  The plan also noted that "[i]t is likely that additional interventions will become necessary such as hormone replacement therapy (HRT) or gender reassignment surgery (GRS)."  (*Id*.).

After approximately six weeks passed without any treatment being initiated, on January 5, 2014, Ms. Manning submitted another DD Form 510 to the Directorate of Treatment Programs requesting a status update on her care, but never received a response. (Manning Decl. ¶ 7).

On January 21, 2014, Ms. Manning submitted a request for redress to Col. Ledwith, the Commandant at the USDB at the time, and Capt. Byrd, her commander at the Personnel Control Facility in Fort Sill, Oklahoma pursuant to Army Regulation (AR) 27-10 and Article 138, Uniform Code of Military Justice (UCMJ).  (*Id*. ¶ 35).  In her request she alleged that the actions taken by Col. Ledwith and Capt. Byrd in refusing to implement a treatment plan for her gender

---

[1] Dr. Malone evaluated Plaintiff once between October 31, 2013 and November 1, 2013; he has not seen her since then.  (Manning Decl. ¶ 28)

dysphoria were arbitrary and unreasonable and requested that a treatment plan consistent with the WPATH Standards of Care be implemented. (*Id.*). Having received no response to her request for redress, on March 4, 2014, she submitted a UCMJ Article 138 complaint of wrong against both Col. Ledwith and Capt. Byrd for their failure to implement a treatment plan in accordance with the WPATH Standards of Care. (*Id.* ¶ 37).

On May 7, 2014, Plaintiff learned through her civilian defense counsel that her Article 138 complaint of wrong had been deemed deficient on March 19, 2014, on the grounds that 1) Col. Ledwith was not Plaintiff's commanding officer; and 2) Capt. Byrd lacked the authority to approve the treatment plan. (Manning Decl. ¶ 38). Because Ms. Manning's chain of command, Capt. Byrd, was the only proper person against whom to bring an Article 138 complaint of wrong but he had no authority to approve her requested treatment, on May 29, 2014 she sought permission to file her complaint against the Commandant of the USDB. (*Id.* ¶ 39). On July 3, 2014, that request was denied. (*Id.* ¶ 40).

At the same time she submitted a request for redress to Col. Ledwith and Capt. Byrd, on January 21, 2014, Ms. Manning also submitted a comparable request for treatment in accordance with WPATH protocols through the Office of the Inspector General. (*Id.* ¶ 41). That request went from the Office of the Inspector General, United States Army Combined Armed Center, Fort Leavenworth, Kansas to the Western Regional Medical Command and ultimately to the Office of the Surgeon General for the Army. (*Id.* ¶¶ 42-43). Ms. Manning never received a response to that request. (*Id.* ¶ 44).

While her other treatment requests were pending, on April 2, 2014, Ms. Manning also submitted a request to the DTP for permission to follow the hair and grooming standards for female prisoners as part of her treatment for gender dysphoria. (*Id.* ¶ 33). On July 23, 2014,

having received no response to her April 2, 2014 request, she renewed that request to the DTP but never received a response to either request.  (Manning Decl. ¶ 33).

On August 20, 2014, approximately six weeks after Defendants became aware that Ms. Manning was being represented by counsel regarding her health care and nine days after Ms. Manning sent a demand letter to Defendants, Dr. Galloway wrote a memorandum recommending that Plaintiff be provided with female undergarments (Strangio Decl., Ex. G), and they were provided shortly thereafter.  (Manning Decl. ¶ 55).  On September 3, 2014, Col. Erica Nelson, the Commandant of USDB, sent a letter to Ms. Manning's counsel responding to the demand letter sent on August 11, 2014.  (Strangio Decl., Ex. H).  In her letter, Col. Nelson stated that Ms. Manning's psychotherapy was expanded sometime after July 18, 2014 to include therapy for gender dysphoria and that she "has also been permitted to begin the 'real-life experience' treatment by being issued female undergarments, specifically female underwear and sports bras." (*Id*.).

According to Ms. Manning's medical records, her treating clinician, Dr. Galloway, had expected treatment per the November 25, 2013 plan to begin around Christmas of 2013. (Strangio Decl., Ex. E).  But no treatment of *any* kind for gender dysphoria – let alone necessary and adequate treatment – was commenced until 8 months later (and more than four years after Army doctors in Iraq first diagnosed her with gender dysphoria).  Dr. Galloway repeatedly told Ms. Manning that decisions regarding her treatment would move slowly because they were being made at the "SecDef" level, meaning the Secretary of Defense.  (Manning Decl. ¶ 32; *see also* Strangio Decl., Ex. E).

Plaintiff continues to be denied permission to outwardly express her female gender by growing her hair and following other female grooming standards. (Manning Decl. ¶¶ 50-52). And she remains without hormone therapy. (*Id*. ¶ 52).

### *Plaintiff's Distress and Urgent Need for Hormone Therapy and Permission to Follow Female Grooming Standards*

On August 27, 2014, Ms. Manning met with Dr. Randi Ettner, an expert in the diagnosis and treatment of gender dysphoria that she retained. (Ettner Decl. ¶ 38). Dr. Ettner confirmed Ms. Manning's gender dysphoria diagnosis and concluded that her condition was moderate to severe. (*Id*. ¶ 39). She noted that Ms. Manning is experiencing symptoms of anxiety, depression and hopelessness because she is not receiving necessary treatment for her gender dysphoria. (*Id*. ¶¶ 41-45). Because gender dysphoria intensifies over time, the longer an individual goes without treatment, the greater the risk of severe harms to her health, Dr. Ettner noted. (*Id*. ¶ 21). Dr. Ettner recommended that hormone therapy be initiated immediately and that Ms. Manning be treated by being permitted to outwardly express her female gender by growing her hair and following the grooming standards applied to female prisoners. (*Id*. ¶¶ 47-49).

Every day that goes by without appropriate treatment, Ms. Manning experiences escalating anxiety, distress, and depression. (Manning Decl. ¶ 55; Ettner Decl. ¶¶ 21, 58). She feels as though her body is being poisoned by testosterone and cannot imagine surviving without hormone therapy and the ability to present her gender outwardly in a manner consistent with her female gender. (Manning Decl. ¶ 53). Dr. Ettner opined that dire medical consequences, including possibly self-castration and suicide, are inevitable if hormone therapy and access to female grooming standards continue to be withheld. (Ettner Decl. ¶¶ 56, 59).

**ARGUMENT**

The D.C. Circuit applies the traditional four-part test for deciding whether to grant a request for a preliminary injunction. *See Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312–13 (1982); *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305 (D.C. Cir. 1987). The movant must establish that (1) she has a substantial likelihood of success on the merits; (2) she would suffer irreparable injury if the injunction is not granted; (3) an injunction would not substantially injure other interested parties; and (4) the public interest would be furthered by the injunction. *Katz v. Georgetown Univ.*, 246 F.3d 685, 687–88 (D.C. Cir. 2001).

Plaintiff meets all of the factors supporting a preliminary injunction. Her claim that Defendants are withholding necessary medical care in violation of the Eighth Amendment is extremely strong on the merits. She will suffer irreparable harm if the Defendants are permitted to continue to withhold medically necessary care. A preliminary injunction will not, however, harm Defendants. To the extent Defendants may claim safety concerns related to housing a female or feminized prisoner, they cannot substantiate such concerns given that Plaintiff is never left alone with other prisoners outside the presence of one or more staff members and is under constant surveillance. (Manning Decl. ¶ 26). The public interest also strongly favors upholding the United States Constitution and preventing avoidable injury to individuals held in government custody.

## I.   PLAINTIFF HAS A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

"A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society." *Brown v. Plata*, 131 S. Ct. 1910, 1928 (2011). Corrections officials inflict cruel and unusual treatment on a prisoner, in violation of the Eighth Amendment, when they are deliberately indifferent to a

prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97 (1976).  To establish an Eighth

Amendment violation, a prisoner must prove (1) that her medical need was *objectively*

sufficiently serious, and (2) that *subjectively* officials acted with a sufficiently culpable state of

mind in failing to treat that need.  *Id*.  Plaintiff suffers from an objectively serious medical

condition that Defendants, acting with deliberate indifference, have failed to treat in violation of

the Eighth Amendment.

> ### A.  Plaintiff's Gender Dysphoria And Risk Of Engaging In Self-Harm Constitute Serious Medical Needs For Purposes Of The Eighth Amendment

To meet the objective requirement of the deliberate indifference standard, a prisoner must

demonstrate the existence of a serious medical need, *Estelle*, 429 U.S. at 104, or demonstrate a

substantial risk of future serious harm resulting from the action or inaction of prison officials,

*Helling v. McKinney*, 509 U.S. 25, 35 (1993).  Here, Plaintiff has established both a serious

medical need – serious distress, anxiety and depression from untreated gender dysphoria – and a

substantial risk of future serious harm – continued anguish, auto-castration and suicide – if her

medically necessary treatment continues to be withheld.

Courts have routinely held that gender dysphoria (also referred to as gender identity

disorder or transsexualism) is a serious medical need.  *See*, *e.g.*, *Meriwether v. Faulkner*, 821

F.2d 408, 411 (7th Cir. 1987) (recognizing transsexualism as a serious medical need that should

not be treated differently than any other psychiatric disorder); *Brown v. Zavaras*, 63 F.3d 967

(10th Cir. 1995) (prison officials must provide treatment to address the medical needs of prisoner

with gender identity disorder); *Fields v. Smith*, 712 F. Supp. 2d 830, 855-56 (E.D. Wis. 2010)

(gender identity disorder is a serious medical need for purposes of the Eighth Amendment),  *aff'd*

653 F.3d 550 (7th Cir. 2011); *Battista v. Clarke*, 645 F.3d 449 (1st Cir. 2011) (upholding district

court decision recognizing gender identity disorder as a serious medical need for purposes of the

Eighth Amendment); *Phillips v. Mich. Dep't of Corr.*, 731 F. Supp. 792, 799 (W.D. Mich. 1990) (complete refusal by prison officials to provide a person with GID with any treatment at all would state an Eighth Amendment claim); *cf. Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000) ("We assume for purposes of this appeal that transsexualism constitutes a serious medical need."). There is no question that Plaintiff has persistent and well-documented gender dysphoria that requires treatment and therefore meets the requirement that her medical need is objectively serious. (Manning Decl. ¶¶ 13, 17-19; Ettner Decl. ¶ 39; Strangio Decl., Ex. A-E).

Plaintiff's well-documented risk of engaging in self-harm in the absence of treatment constitutes an independent serious medical need for purposes of the Eighth Amendment deliberate indifference standard. Plaintiff feels like she is being poisoned by the testosterone in her body. (Manning Decl. ¶ 53). Like many individuals with persistent gender dysphoria, the pain and distress caused by this experience has led her to consider self-surgery to remove her testicles in order to free herself from the effects of testosterone and even to consider and, in the past to plan on, committing suicide. (Manning Decl. ¶ 14; Ettner Decl. ¶¶ 42, 53, 55). If hormone therapy and access to female grooming standards continue to be withheld, Plaintiff is at extremely high risk of resorting to self-harm. (Manning Decl. ¶ 55; Ettner Decl. ¶¶ 53, 55). In *De'lonta v. Angelone* (*De'lonta I*), 330 F.3d 630, 634 (4th Cir. 2003), the Fourth Circuit held that a prisoner with diagnosed gender dyphoria's "need for protection against continued self-mutilation constitutes a serious medical need to which prison officials may not be deliberately indifferent." *See also Lee v. Downs*, 641 F.2d 1117, 1121 (4th Cir. 1981) ("[P]rison officials have a duty to protect prisoners from self-destruction or self-injury."); *Soneeya v. Spencer*, 851 F. Supp. 2d 228 (D. Mass. 2012) (prisoner with GID and history of suicide attempts and self-mutilation has serious medical condition for which surgery must be considered); *Kosilek v.*

*Maloney*, 221 F. Supp. 2d 156, 184 (D. Mass 2002) (prisoner with gender identity disorder's risk

of engaging in self-harm constituted serious medical need); *see generally* George R. Brown,

*Autocastration and Autopenectomy as Surgical Self-Treatment in Incarcerated Persons with*

*Gender Identity Disorder*, 12 Int'l J. of Transgenderism 31 (2010).  The law is clear that "a

remedy for unsafe conditions need not await a tragic event."  *Helling v. McKinney*, 509 U.S. 25,

33 (1993).[2]

### B.  Defendants Have Acted With Deliberate Indifference To Plaintiff's Serious Medical Needs

The subjective prong is one of deliberate indifference, which "entails something more

than mere negligence . . . [but] is satisfied by something less than acts or omissions for the very

purpose of causing harm or with knowledge that harm will result."  *Farmer v. Brennan*, 511 U.S.

825, 835 (1994).  If Defendants knew that the risk existed and either intentionally or recklessly

ignored it, and will continue to do so in the future, then the subjective test has been met.  *Id*. at

837-47.  This indifference is impermissible "whether … manifested by prison doctors in their

response to the prisoner's needs or by prison guards in intentionally denying or delaying access

to medical care or intentionally interfering with the treatment once prescribed."  *Estelle*, 429 U.S.

at 105-06.  Here, Defendants are aware of Plaintiff's gender dysphoria, her past suicide plans,

her thoughts of self-castration, and her escalating distress at having treatment withheld.

(Manning Decl. ¶ 32).  Defendants' medical providers agree that the WPATH Standards of Care

are the appropriate protocols for treating gender dysphoria.  (Strangio Decl., Ex. B, D).  Yet,

despite this, Defendants have continued to deny treatment that the WPATH Standards of Care

---

[2]  The Eighth Amendment protects against current health harms as well as future ones. *Roe v. Elyea*, 631 F.3d 843, 858 (7th Cir. 2011) ("the Eighth Amendment 'protects [an inmate] not only from deliberate indifference to his or her current serious health problems, but also from deliberate indifference to conditions posing an unreasonable risk of serious damage to future health.'" (internal citation omitted)).

identify as medically necessary for many individuals with gender dysphoria and which are

medically necessary for Plaintiff according to Dr. Ettner, an expert in the treatment of this

condition.  (Strangio Decl. Ex. B; Ettner Decl. ¶¶ 30-31, 47-49).

> **1.    Defendants Have Acted With Deliberate Indifference By Failing To Provide Adequate Treatment For Plaintiff's Serious Medical Needs**

Government officials act with deliberate indifference when they refuse to provide

medically necessary treatment to prisoners.  *Estelle*, 429 U.S. 97.  The relevant inquiry is not

whether any care has been provided but whether "constitutionally adequate" care has been

provided.  *Id.* at 103-06 (prison officials may not adopt an "easier and less efficacious treatment"

that does not adequately address a prisoner's serious medical needs); *Edwards v. Snyder*, 478

F.3d 827, 831 (7th Cir. 2007) (treatment cannot be "blatantly inappropriate").  It is well

established that, while prisoners may not be entitled to any particular treatment of their choosing,

medical care in prison cannot be "so cursory as to amount to no treatment at all." *Ancata v.

Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985).  *See also Langford v. Norris*, 614

F.3d 445, 460 (8th Cir. 2010) ("a total deprivation of care is not a necessary condition for finding

a constitutional violation"); *Jones v. Muskegon Ctny.*, 625 F.3d 935, 944 (6th Cir. 2010) (prison

officials may not avoid liability "simply by providing some measure of treatment").[3]

These well-established principles apply just as strongly in the context of treatments for

gender dysphoria.  Courts have repeatedly held that limiting treatment for gender dysphoria to

psychotherapy where hormone therapy is medically indicated violates the Eighth Amendment.

*See, e.g., Kothmann v. Rosario*, 558 F. App'x 907, 910 (11th Cir. 2014) (denying qualified

---

[3] The Eighth Amendment guarantees medical care "at a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards." *United States v. DeCologero*, 821 F.2d 39, 43 (1st Cir. 1987); *see also Moore v. Duffy*, 255 F.3d 543, 545 (8th Cir. 2001) (Medical treatment may not "so deviate from the applicable standard of care as to evidence a physician's deliberate indifference.").

immunity to prison official who failed to treat transgender prisoner with hormone therapy who was treated with "anti-anxiety and anti-depression medications, mental health counseling, and psychotherapy treatments"); *Fields*, 653 F.3d 550, 556 (7th Cir. 2011) ("Although DOC can provide psychotherapy as well as antipsychotics and antidepressants, defendants failed to present evidence rebutting the testimony that these treatments do nothing to treat the underlying disorder."). In *De'lonta v. Johnson* (*De'lonta II*), 708 F.3d 520, 526 (4th Cir. 2013), the court held that "just because Appellees have provided De'lonta with *some* treatment consistent with the GID Standards of Care, it does not follow that they have necessarily provided her with constitutionally adequate treatment." (emphasis in original). The Defendants in this case have denied Plaintiff constitutionally adequate treatment by withholding the medical care that she needs, failing to have her treated by a professional qualified to treat gender dysphoria, and delaying her treatment for non-medical reasons.

The Defendants are aware that Plaintiff has gender dysphoria requiring treatment and agree that the WPATH Standards of Care govern such treatment but have failed to provide treatment consistent with those standards to meet her medical needs. For patients like Plaintiff with well-documented and persistent gender dysphoria, hormone therapy is medically indicated to alleviate the significant distress caused by the condition. (Ettner Decl. ¶¶ 31, 47). Defendants claim that treatment has been provided in the form of psychotherapy and female undergarments. (Strangio Decl., Ex. H). But for the past year, Dr. Galloway has documented Plaintiff's escalating anxiety and depression caused by her gender dysphoria. (Manning Decl. ¶ 32; Strangio Decl., Ex. E). Non-medical interventions do not obviate the need for hormone therapy where such medical intervention is indicated. (Ettner Decl. ¶ 29); *see also Fields*, 653 F.3d at 556 (affirming district court finding that "for certain patients with GID, hormone therapy is the

only treatment that reduces dysphoria and can prevent the severe emotional and physical harms associated with it."). Dr. Ettner, an expert in treating gender dysphoria, *see Fields*, 712 F. Supp. 2d at 837-38, evaluated Plaintiff and confirmed that hormone therapy and access to female grooming standards to outwardly express her gender identity are medically necessary to treat her moderate-to-severe gender dysphoria. (Ettner Decl. ¶¶ 47-49).

The alleged treatments provided to Plaintiff are not constitutionally adequate. Defendants suggest that they have implemented the real life experience as part of Plaintiff's treatment. (Strangio Decl., Ex. D, G, H). However, the mere provision of undergarments is not treatment. (Ettner Decl. ¶ 50). The purpose of the real life experience is to mitigate distress caused by the gender dysphoria through dressing, grooming and otherwise outwardly presenting oneself through social signifiers of gender consistent with one's gender identity. (*Id.* ¶¶ 30, 50). This attempt to treat Plaintiff's gender dysphoria with undergarments only has had the opposite effect of mitigating her distress and has in fact worsened it, causing Plaintiff to feel like a "man in a bra." (Manning Decl. ¶ 53). Meanwhile, both Dr. Galloway and Lt. Col. Keller have recognized that hormone therapy will ultimately be necessary to treat Plaintiff's gender dysphoria but have provided no evaluation for such treatment by a medical professional qualified to assess and treat gender dysphoria patients. (Strangio Decl., Ex. B, D).

Where a condition requires specialized treatment or referral to a specialist for evaluation, failure to provide such treatment or referral constitutes deliberate indifference. Plaintiff's treating clinician at the USDB acknowledged in a memorandum made available to Plaintiff that she is not qualified to treat gender dysphoria. (Strangio Decl., Ex. C).[4] "'Adequate medical care'

---

[4] Dr. Malone, who Dr. Galloway referred to as an "expert," evaluated Plaintiff on October 21 and November 1, 2013, but has not seen her since then and has never treated her. (Manning Decl. ¶ 28).

requires treatment by qualified medical personnel who provide services that are of a quality

acceptable when measured by prudent professional standards in the community, tailored to an

inmate's particular medical needs, and that are based on medical considerations." *Barrett v.*

*Coplan*, 292 F. Supp. 2d 281, 285 (D.N.H. 2003). This includes making referrals to specialists

where appropriate. In *De'lonta II*, 708 F.3d at 524, the Fourth Circuit held that a prisoner with

gender dysphoria made out a claim of deliberate indifference where prison officials failed to

have her evaluated by a specialist to assess her need for sex reassignment surgery.[5]

Adequate care of a patient with gender dysphoria requires qualified, appropriately trained

clinicians with clinical experience in the treatment of the condition. The WPATH Standards of

Care emphasize the importance of supervised training and first-hand clinical experience. (Ettner

Decl. ¶¶ 25-28). By having a doctor assess Plaintiff's treatment needs who herself recognizes

that she is not qualified to do so, Defendants plainly act with deliberate indifference to Plaintiff's

serious medical needs. Plaintiff's expert, who has expertise in treating gender dysphoria, has

recommended that hormone therapy be initiated immediately and that Plaintiff be permitted to

follow female grooming standards to prevent adverse health consequences. (*Id.* ¶¶ 47-49). If

Defendants are permitted to continue to rely on unqualified providers to assess Plaintiff's

medical needs, her treatment needs will never be properly assessed, she will continue to suffer,

and grave medical and mental health consequences will inevitably flow from such indifference.

(*Id.* ¶ 55-56); *see H.C. by Hewett v. Jarrard*, 786 F.2d 1080, 1086 (11th Cir.1986) ("The failure

to provide diagnostic care" constitutes deliberate indifference).

---

[5] *See also Hayes v. Snyder*, 546 F.3d 516, 526 (7th Cir. 2008) (refusal to refer to a specialist where doctor did not know cause of reported extreme pain could support deliberate indifference finding); *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005) (doctor could be deliberately indifferent for refusing to send a prisoner to a specialist or to order an endoscopy despite prisoner's complaints of severe pain).

It is also well established that intentional delay in providing necessary medical care violates the Eighth Amendment.  *See Brown v. District of Columbia*, 514 F.3d 1279, 1283 (D.C. Cir. 2008) (government officials act with deliberate indifference when delaying or denying access to medical care once prescribed); *Arnett v. Webster*, 658 F.3d 742, 752 (7th Cir. 2011) (failure of medical officials to provide prisoner medication to treat his rheumatoid arthritis over 10-month period despite his repeated requests was sufficient to allege deliberate indifference); *Jett v. Penner*, 439 F.3d 1091 (9th Cir. 2006) (delay of over a year before seeing a hand specialist); *Spruill v. Gillis*, 372 F.3d 218, 237 (3d Cir. 2004) (prisoner stated a claim for deliberate indifference where he alleged that prison doctor knew he had a serious back condition and refused to examine him on numerous occasions); *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582-83 (3d Cir. 2003) (delay of 21 hours in providing insulin to diabetic stated Eighth Amendment claim); *Wallin v. Norman*, 317 F.3d 558 (6th  Cir. 2003) (delay of one week in treating urinary tract infection, and one day in treating leg injury stated claim of deliberate indifference under the Eighth Amendment); *McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir. 2004) (extended delay in starting Hepatitis C treatment because prisoner might be released within twelve months of starting treatment stated claim of deliberate indifference under the Eighth Amendment).

Though Defendants have known for more than four years that Plaintiff suffers from gender dysphoria and a treatment plan was created in November of 2013 recognizing an urgent need for treatment, no action was taken on Plaintiff's treatment until August of 2014 – nine months later, and only after Plaintiff retained counsel.  (Manning Decl. ¶ 50).  The treatment that was ultimately provided was not only medically and constitutionally inadequate but has caused Plaintiff to suffer further distress.  The delays in treating Plaintiff are undoubtedly caused, at

least in part, by the fact that decisions related to her treatment are being made by medical

providers without the necessary expertise to assess her treatment needs and by administrative

officials without medical training, contact with Plaintiff, or day-to-day knowledge of the

USDB's operations.  (Manning Decl. ¶ 32; Strangio Decl., Ex. E).

> **2.      Plaintiff Has Been Categorically Denied Hormone Therapy And Other Medically Necessary Treatment For Non-Medical Reasons And With Deliberate Indifference To Her Serious Medical Needs**

The Eighth Amendment requires that prisoners be provided with adequate medical care

"based on an individualized assessment of an inmate's medical needs in light of relevant medical

considerations."  *Soneeya*, 851 F. Supp. 2d at 242.  Given this need for individualized

assessment, exclusionary policies that bar certain forms of medical treatment regardless of

medical need for the treatment violate the Eighth Amendment.  *See Johnson v. Wright*, 412 F.3d

398, 406 (2d Cir. 2005) (denial of hepatitis C treatment to a prisoner based on a policy that a

particular drug could not be administered to inmates with recent history of substance abuse could

constitute deliberate indifference since policy did not allow exceptions based on medical need);

*Mahan v. Plymouth Cnty. House of Corr.*, 64 F.3d 14, 18 n.6 (1st Cir. 1995) ("inflexible"

application of prescription policy may violate Eighth Amendment); *Jorden v. Farrier*, 788 F.2d

1347, 1349 (8th Cir. 1986) (application of prison pain medication policies must be instituted in a

manner that allows individualized assessments of need).

Courts have routinely held prison policies that automatically exclude certain forms of

treatment for gender dysphoria violate the Eighth Amendment.  In *Fields v. Smith*, 653 F.3d 550

(7th Cir. 2011), the Seventh Circuit held that a state law that barred hormone therapy and sex

reassignment surgery as possible treatments for prisoners with gender dysphoria facially violated

the Eighth Amendment.   Similarly, in *De'lonta I*, 330 F.3d 630, the Fourth Circuit held that a

prisoner with gender dysphoria stated a claim for deliberate indifference where the Department

of Corrections withheld hormone therapy pursuant to a policy against providing such treatment

and not the medical judgment of qualified providers.  *See also Allard v. Gomez*, 9 Fed. App'x.

793, 795 (9th Cir. 2001) ("[T]here are at least triable issues as to whether hormone therapy was

denied Allard on the basis of an individualized medical evaluation or as a result of a blanket rule,

the application of which constituted deliberate indifference to Allard's medical needs.");

*Soneeya*, 851 F. Supp. 2d at 249 (holding that a prison policy that "removes the decision of

whether sex reassignment surgery is medically indicated for any individual inmate from the

considered judgment of that inmate's medical providers" violated Eighth Amendment); *Houston*

*v. Trella,* No. 04-1393, 2006 WL 2772748, at *8 (D.N.J. Sept. 22, 2006) (claim that prison

doctor's decision not to provide hormone therapy to prisoner with GID based not on medical

reason but policy restricting provision of hormones stated viable Eighth Amendment claim);

*Barrett v. Coplan*, 292 F. Supp. 2d 281, 286 (D.N.H. 2003) ("A blanket policy that prohibits a

prison's medical staff from making a medical determination of an individual inmate's medical

needs [for treatment related to gender identity disorder] and prescribing and providing adequate

care to treat those needs violates the Eighth Amendment."); *Brooks v. Berg*, 270 F. Supp. 2d 302,

312 (N.D.N.Y. 2003) (prison officials cannot deny inmates medical treatment for gender

dysphoria based on a policy of limiting such treatments to inmates who were diagnosed prior to

incarceration), *vacated in part on other grounds*, *Brooks v. Berg*, 289 F. Supp. 2d 286 (N.D.N.Y.

2003).

   Since Plaintiff first requested treatment for gender dysphoria, Defendants have repeatedly

stated to her and publicly that Army and USDB policy do not permit hormone therapy or other

treatment that could outwardly feminize a prisoner at the USDB, (Strangio Decl. Ex. B, I, J;

Manning Decl. ¶ 21), which are treatments that are medically indicated for Plaintiff.  (Ettner

Decl. ¶¶ 47-49; Strangio Decl., Ex. B, D).  Instead of exercising any informed medical judgment

regarding Plaintiff's medical need for these particular treatments, Defendants have reflexively

followed a policy that ensures that Plaintiff will never be meaningfully evaluated for or permitted

to undergo treatment that could outwardly feminize her appearance regardless of the medical

need for that treatment or the severity of her symptoms. Defendants' denial of medically

necessary treatment based on a written or *de facto* administrative policy that leaves no room for

medical judgment "is the very definition of deliberate indifference." *Colwell v. Bannister*, No.

12-15844, --- F.3d ----, 2014 WL 3953769 at *5 (9th Cir. Aug. 14, 2014) (holding that prison

policy of barring cataract surgery where one eye would retain functionality without room for

medical determination violated Eighth Amendment).

### 3. Prisoners' Medical Care Cannot Be Withheld Based On Pretextual Security Justifications

The Eighth Amendment does not permit wholesale deference to prison officials in the

administration of prisoner medical care.  While courts acknowledge that "'the realities of prison

administration' are relevant to the issue of deliberate indifference," *Kosilek*, 221 F. Supp. 2d at

191 (quoting *Helling v. McKinney*, 509 U.S. 25, 37 (1993)), they repeatedly emphasize that

"judgments concerning the care to be provided to inmates for their serious medical needs

generally must be based on medical considerations." *Id.* (citing, *inter alia*, *Estelle*, 429 U.S. at

104 n.10; *Durmer v. O'Carroll*, 991 F.2d 64, 67-69 (3d Cir. 1993).

Defendants have suggested that their policy against providing hormone therapy and

permitting Plaintiff to follow female grooming standards is based on an inability to house a

feminized inmate, asserting concerns about reactions from other inmates and the ability to keep

Plaintiff safe if she were to undergo feminizing treatments.  (Strangio Decl., Ex. B).  However,

these asserted concerns are pretextual, given that Plaintiff has already been identified as being vulnerable to sexual and physical violence, and the facility is already addressing that security concern by assuring that she is never in the presence of other prisoners without staff present. (Manning Decl. ¶¶ 21, 26).  These same arguments have been raised by prison officials in other cases involving the medical treatment of prisoners with gender dysphoria and have not been credited by the courts.  *See*, *e.g.*, *Battista v. Clarke*, 645 F.3d 449, 452 (1st Cir. 2011) (affirming district court holding that hormone therapy could be safely administered to prisoner despite security concerns raised by prison staff, which were undercut by "pretexts, delays, and misrepresentations"); *Fields* 653 F.3d at 557 (rejecting prison security argument because "transgender inmates may be targets for violence even without hormones" and defendants' expert "testified that it would be 'an incredible stretch' to conclude that banning the use of hormones could prevent sexual assaults"); *cf. Fields*, 712 F. Supp. 2d at 868 (in analyzing equal protection claim the court found that "no reasonably conceivable state of facts provides a rational tie between [the ban on hormone therapy] and prison safety and security.").

## II.     PLAINTIFF WILL SUFFER IRREPARABLE INJURY ABSENT AN INJUNCTION

To obtain a preliminary injunction, Plaintiff need not demonstrate that irreparable injury is inevitable, but only that it "is *likely* in the absence of an injunction." *Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 22 (2008) (emphasis in original).  Plaintiff has already suffered serious distress, anxiety and depression, has contemplated self-surgery and planned for suicide. (Manning Decl. ¶¶ 14, 49-55; Ettner Decl. ¶¶ 53-55).  As Dr. Randi Ettner explained, "Gender dysphoria intensifies over time.  The longer an individual goes without treatment, the greater the risk of severe harms to her health." (Ettner Decl. ¶ 21).  Plaintiff is at an exceedingly high risk for suicidality and auto-castration due to her past plans to commit suicide and thoughts of auto-

castration to relieve the distress caused by the testosterone that her body produces.  (Ettner Decl. ¶¶ 53-55; Manning Decl. ¶¶ 49-55).   Absent an injunction, Defendants' actions in withholding medically necessary care are likely to result in serious medical and psychological pain and suffering to Plaintiff, including possibly permanent injury or death.  (Ettner Decl. ¶¶ 53-56).

Death and serious bodily injury are the very definition of irreparable injuries.  *See, e.g.*, *Wilson v. Group Hospitalization & Med. Servs., Inc.*, 791 F. Supp. 309, 313-314 (D.D.C. 1992) (granting preliminary injunction where, absent injunctive relief preventing denial of medical benefits, plaintiff "faced nearly certain death, the ultimate irreparable injury"); *Qualls v. Rumsfeld*, 357 F. Supp. 2d 274, 286 (D.D.C. 2005) (finding irreparable harm where plaintiff faced a "great risk of harm and death as a result of his continuing service" on active duty in Iraq); *Henderson v. Bodine Aluminum, Inc.*, 70 F.3d 958, 961 (8th Cir. 1995) ("It is hard to imagine a greater harm than losing a chance for potentially life-saving medical treatment." (citation omitted)); *Harris v. Bd. of Supervisors*, 366 F.3d 754, 766 (9th Cir. 2004) ("pain, infection, amputation, 0medical complications, and death" constitute irreparable harm).

In addition to the risk of psychological harm, serious bodily injury or possibly death absent an injunction, Plaintiff will also suffer irreparable harm in the deprivation of her constitutional rights.  "'When an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.'"  *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) (citing 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (2d ed. 1995)).  "It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'"  *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (*quoting Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality)); *Klayman v. Obama*, 957 F. Supp.

2d 1 (D.D.C. 2013) (same), *appeal docketed*, No. 14-5027 (D.C. Cir. Aug. 28, 2014).  Here,

Plaintiff has clearly shown a strong likelihood of success on the merits of her Eighth Amendment

claim and that absent an injunction her constitutional right to be free from cruel and unusual

punishment will be lost.

## III.    THE BALANCE OF HARMS STRONGLY FAVORS PLAINTIFF

The balance of harms strongly favors the Plaintiff.  As Plaintiff has shown, the harm to

her is significant.  Every day that she goes without necessary treatment her mental health

deteriorates and her risk of future suicidality and self-harm increases.  The risk to her mental and

physical health is both great and certain.  (Ettner Decl. ¶¶ 56, 61).  On the other side of the scale,

Defendants will not suffer any harm – much less irreparable harm – from providing necessary

medical care to Plaintiff consistent with their constitutional obligations.  *See, e.g., Brugliera v.

Comm'r of Mass. Dep't of Corr.,* No. 07-40323, 2009 U.S. Dist. LEXIS 131002 *34-5 (D. Mass.

Dec. 16, 2009) (balance of harms favored plaintiff who would "suffer ongoing irreparable harm

manifested by intense mental anguish" while defendants would experience minimal security

risks); *Gammett v. Idaho State Bd. of Corrs.*, No. CV05–257, 2007 WL 2186896, at *15-16 (D.

Idaho July 27, 2007) (balance of harms "sharply" favored plaintiff, who would experience

extreme mental harm, including suicide attempts, without GID treatment, while defendants did

not allege that they would suffer harm from providing such treatment).  The government cannot

suffer harm by being required to comply with the law.  *Zepeda v. INS*, 753 F.2d 719, 727 (9th

Cir. 1983).

## IV.    AN INJUNCTION IS IN THE PUBLIC INTEREST

It is in the public interest to uphold constitutional protections. *See*, *e.g.*, *O'Donnell

Constr. Co. v. District of Columbia*, 963 F.2d 420, 429 (D.C. Cir. 1992) ("[I]ssuance of a

preliminary injunction would serve the public's interest in maintaining a system of laws free of unconstitutional racial classifications."); *Cortez III Serv. Corp. v. Nat'l Aeronautics & Space Admin.*, 950 F. Supp. 357, 363 (D.D.C. 1996) (public interest served by upholding the Constitution); *Kotz v. Lappin*, 515 F. Supp. 2d 143, 152 (D.D.C. 2007) ("The public certainly has an interest in the judiciary intervening when prisoners raise allegations of constitutional violations." (*citing Rhodes v. Chapman*, 452 U.S. 337, 362 (1981)); *Klayman*, 957 F. Supp. 2d at 42 ("'[I]t is always in the public interest to prevent the violation of a party's constitutional rights.'" (internal citations omitted)).

## CONCLUSION

For these reasons, the Court should issue a preliminary injunction directing Defendants to provide Plaintiff with clinically appropriate treatment under the *Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People* developed by the World Professional Association for Transgender Health, including, but not limited to, (1) providing hormone therapy for Plaintiff's gender dysphoria; (2) permitting Plaintiff to express her female gender by following female grooming standards, including dress and hair length; and (3) providing Plaintiff with treatment by a clinician who is qualified to treat gender dysphoria.

The Court should require no bond or at most a nominal bond under Fed. R. Civ. P. 65(c). "The amount of security required is a matter for the discretion of the trial court; it may elect to require no security at all." *Corrigan Dispatch Co. v. Case Guzman, S.A.* 569 F.2d 300, 303 (5th Cir. 1978); *see also Cobell v. Norton*, 225 F.R.D. 41, 50 n. 4 (D.D.C. 2004) ("it is within the Court's discretion to waive Rule 65(c)'s security requirement where it finds such a waiver to be appropriate in the circumstances"). Plaintiff is in no position to post a bond, and her government-imposed poverty should not prevent the Court from enjoining the government's

ongoing violation of her constitutional rights.  *See NRDC v. Morton*, 337 F. Supp. 167 (D.D.C.

1971).

Respectfully submitted,

/s/ *Arthur B. Spitzer*
Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union of the Nation's Capital
4301 Connecticut Avenue, N.W., Suite 434
Washington, DC 20008
Tel. 202-457-0800
Fax 202-457-0805
artspitzer@aclu-nca.org

Chase B. Strangio
Rose Saxe
James D. Esseks
American Civil Liberties Union
125 Broad St., 18th Fl.
New York, NY 10004
Tel. 212.549.2627
Fax 212.549-2650
cstrangio@aclu.org
rsaxe@aclu.org
jesseks@aclu.org

Stephen Douglas Bonney
ACLU Foundation of Kansas
3601 Main Street
Kansas City, MO 64111
Tel. (816) 994-3311
Fax (816) 756-0136
dbonney@aclukswmo.org

David E. Coombs
Law Office of David E. Coombs
11 South Angell Street, #317
Providence, RI  02906
Tel. 508-689-4616
Fax (508) 689-9282
info@armycourtmartialdefense.com

September 23, 2014